**Gweldon Lee PASCHALL et al., Appellees,**

v.

**KANSAS CITY STAR CO., Appellant.**

**No. 79–1128.**

United States Court of Appeals, Eighth Circuit.

Submitted April 19, 1979.

Decided Sept. 4, 1979.

John T. Martin, Shook, Hardy & Bacon, Kansas City, Mo., for appellant; Sam L. Colville and Gary L. Whittier, Kansas City, Mo., and Robert L. Ballow and Daniel C. Kaufman, King & Ballow, Nashville, Tenn., on briefs.

Sheridan Morgan, Morris, Larson, King, Stamper & Bold, Kansas City, Mo., for appellees; Harry A. Morris, Donald H. Loudon, David M. Rhodus, and William M. Modrcin, Kansas City, Mo., on brief.

Before ROSS, STEPHENSON and HENLEY, Circuit Judges.

STEPHENSON, Circuit Judge.

This private antitrust case is before us under 28 U.S.C. § 1292(b). The specific

question, certified by the district court,[1] and accepted for appeal by this court, as a controlling question of law as to which there is a substantial ground for difference of opinion, is whether certain proposed actions of appellant-defendant Kansas City Star Co. would constitute a violation of section 2 of the Sherman Act, 15 U.S.C. § 2.

We have carefully considered the arguments of the Kansas City Star and appellee-plaintiff, Gweldon Lee Paschall,[2] and have determined that the Star's application for leave to take interlocutory appeal was improvidently granted. We thus remand this case to the district court for proceedings not inconsistent with this opinion.

## I. Facts

The plaintiffs in this case initially filed suit against the Star on January 13, 1975, alleging, *inter alia*, violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and section 3 of the Clayton Act, 15 U.S.C. § 14.

The plaintiffs, Paschall and over 200 other persons, are independent contract carriers who currently purchase newspapers from the Star and, in turn, sell and deliver them to their subscribers. This system of delivery has been used by the Star for many years.

In September 1977, the Star publically announced a changeover in its system of distribution. The Star stated that it would terminate all existing contracts with individual carriers; that it would no longer sell papers to the plaintiffs for retail distribution; and that it would thereafter deliver and sell the papers to the subscribers directly. The district court noted in its opinion that each individual contract carrier was offered an opportunity to negotiate one of the new delivery agent contracts with the Star; that the new contracts provided that the carriers would make approximately the same income as each did under the old individual contract carrier contracts; and that "[n]othing in the delivery agent contracts would prevent or discourage delivery agents from delivering other companies' publications * * *, * * * and the evidence does not indicate that The Kansas City Star * * * would discourage such deliveries."[3]

On September 30, plaintiffs requested a temporary restraining order and preliminary injunctive relief to prevent the Star from terminating the contracts with the independent contract carriers; on October 27, 1977, the district court[4] granted the preliminary injunction. *Paschall v. Kansas City Star Co.*, 441 F.Supp. 349 (W.D.Mo. 1977).

Pursuant to a pre-trial order filed October 19, 1978 and Fed.R.Civ.P. 20, trial began on October 26, 1978, to litigate two issues only:

A. Does the defendant, the Kansas City Star Company, have monopoly power in a relevant product market in a relevant geographical market?

B. If so, has the defendant used monopoly power to foreclose competition, gain a competitive advantage, or destroy competitors?[5]

On November 10, 1978, the trial court, in its memorandum of decision, limited the

---

1. The Honorable Warren K. Urbom, Chief Judge of the United States District Court for the District of Nebraska, sitting by special designation in the United States District Court for the Western District of Missouri, entered a memorandum of decision which was certified pursuant to 28 U.S.C. § 1292(b) by the Honorable Elmo B. Hunter, United States District Judge, Western District of Missouri. Judge Hunter had previously granted a preliminary injunction to plaintiffs, *Paschall v. Kansas City Star Co.*, 441 F.Supp. 349 (W.D.Mo.1977). Judge Urbom's opinion is unpublished, *Paschall v. Kansas City Star Co.*, No. 75–CV–36–W–4 (W.D.Mo. Nov. 10, 1978).

2. Paschall is the named representative of the class, a group of newspaper carriers for the Star.

3. *Paschall v. Kansas City Star Co.*, No. 75–CV–36–W–4, slip op. at 7 (W.D.Mo. Nov. 10, 1978).

4. The Honorable Elmo B. Hunter, United States District Judge for the Western District of Missouri.

5. The trial court also specifically noted in its memorandum of decision following the trial that "[a]ppropriateness of possible remedies is not discussed, it having been understood from the outset of the recent trial that a separate

decision to the finding of facts and conclusions of law on the "single issue" of whether implementation of the Star's new distribution proposal would violate section 2 of the Sherman Act, 15 U.S.C. § 2.

The district court first made a finding as to the relevant product, "metropolitan daily newspapers in general circulation throughout the metropolitan area of Kansas City," and the relevant geographical area, the seven-county area in Missouri and Kansas around Kansas City, Missouri. The court concluded that the Star had a publication monopoly of the relevant product in the relevant geographical area. The court found that the Star did not, however, possess a monopoly of the distribution of metropolitan daily newspapers. The district court further found that, although negligible, some sales and distribution efforts had been made by the Star. Finally, the court found that the Star was at all times a "potential or probable competitor" of the independent contract carriers. Where a carrier failed to perform, whether for justifiable business reasons or for nonjustifiable personal reasons, the Star would step in and take over. In only one instance, however, did the Star compete in the sense of making the deliveries on a carrier's route when the carrier preferred to make the deliveries. This occurred when some of the customers on that route complained that the carrier had raised prices.[6] Thus, although it was admittedly *de minimus*, there was some

competition at the distribution level between the Star and the independent distributors. The district court stated:

> By contract right, by act, and by word the company made known its hovering presence at the fringe of the market. There is testimony that that presence tended to have a retardent effect on retail prices to the subscriber, and common sense confirms the reasonableness of that conclusion.
>
> *  *  *  *  *  *
>
> The company's refusal to sell to the carriers necessarily means that the retardent effect of the potential competition is eliminated and the company's monopoly extended into the sales and distribution arena.

*Paschall v. Kansas City Star Co.*, No. 75–CV–36–W–4, slip op. at 6 (W.D.Mo. Nov. 10, 1978). The district court made no finding as to whether there was competition between the distributors.

The district court also found that the Star had legitimate business reasons for changing to a delivery-agent system;[7] that the new delivery system would not "destroy the carriers as an effective delivery system" and that the carriers would be in just as good a position to "remain a viable delivery system" under the delivery-agent contract as under the independent contract carrier contract; and that the actions of the Star did not create "barriers to the entering into the market by future competitors."

---

hearing might be needed for presentation of evidence on that subject, if the decision were for the plaintiff and interveners."

**6.** The district court explained the incident:

In one instance in 1970 a carrier raised prices to customers at an apartment complex and customers complained, whereupon the company delivered papers direct to the customers —45 or 50 of them—if the customers specifically asked the company to do so. [The district court further stated] [s]pecial events, such as the Kennedy assassination, the moon landing, baseball games, or religious conventions sometimes prompted The Kansas City Star Company to sell extra papers direct to readers.

*Paschall v. Kansas City Star Co.*, No. 75–CV–36–W–4, slip op. at 4 (W.D.Mo. Nov. 10, 1978).

**7.** The district court noted:

The defendant is correct in urging that changing to a delivery agent system had legitimate business reasons for its adoption. The new system would give the company control over pricing to the subscriber, thereby being able to advertise subscription prices, which is quite impossible where carriers largely determine the ultimate specific prices. It would permit the company to assure more rapid "starts" for new subscribers, and would allow uniform policy regarding time of collection, manner of payment by customers, and method of responding to customer complaints, all of which have been problems under the independent contract carrier system.

*Paschall v. Kansas City Star Co.*, No. 75–CV–36–W–4, slip op. at 6 (W.D.Mo. Nov. 10, 1978).

The court, in its Memorandum and Order on Motion to Amend memorandum of decision, stated:

> Once the defendant refuses to sell to the plaintiffs, sells to the customers itself, and uses delivery agents for distribution, the competitive tension will be gone. Whereas there has been a retardant effect on retail prices until now, there will no longer be, because the cause will have disappeared. That is an anti-competitive result. It is a spreading of the defendant's monopoly. It is an act of monopolization * * * .[8]

Thus, primarily upon this basis, the district court determined that the proposed delivery system would violate section 2 of the Sherman Act.

The district court,[9] in its certification under section 1292(b), stated "[i]t is this Court's further opinion that the remedy stage of these proceedings will be complex as well as lengthy and, therefore, immediate appellate review of [the findings made by the district court] may materially advance the ultimate termination of this entire litigation."

The above fully represents the record we have before us on this section 1292(b) appeal.

## II. *28 U.S.C. § 1292(b)*

■ The general purpose of section 1292(b) is to provide interlocutory appeal in exceptional cases in order to avoid protracted and expensive litigation.[10] C. Wright, Law of Federal Courts § 102 at 518 (3d ed. 1976). In order to satisfy section 1292(b) requirements, a case must involve an issue that concerns:

(1) a controlling question of law as to which there is

(2) a substantial ground for difference of opinion and upon which

(3) a decision will materially advance the ultimate outcome of the litigation.

Inherent in these requirements is the concept of ripeness. *See Control Data Corp. v. IBM Corp.*, 421 F.2d 323 (8th Cir. 1970). While it might be conceivable that an issue includes a controlling question of law, and while it might be seemingly apparent that it is a difficult question as to which there is a substantial ground for difference of opinion, and while a decision thereon might materially advance the ultimate outcome, the case must be of sufficient ripeness so that this can be determined from the record. The purpose of section 1292(b) is not to offer advisory opinions "rendered on hypotheses which [evaporate] in the light of full factual development." *Minnesota v. United States Steel Corp.*, 438 F.2d 1380, 1384 (8th Cir. 1971). Consideration of the factual basis must be such that a sound premise exists upon which the legal issues can be determined with precision. *Id.*[11]

---

**8.** The trial court took note of *Newberry v. Washington Post Co.*, 438 F.Supp. 470 (D.C. 1977); *Hardin v. Houston Chronicle Publishing Co.*, 434 F.Supp. 54 (S.D.Tex.1977), *aff'd*, 572 F.2d 1106 (5th Cir. 1978); *Lamarca v. Miami Herald Publishing Co.*, 395 F.Supp. 324 (S.D. Fla.), *aff'd per curiam*, 524 F.2d 1230 (5th Cir. 1975); *Knutson v. Daily Review, Inc.*, 383 F.Supp. 1346 (N.D.Cal.1974), *rev'd in part*, 548 F.2d 795 (9th Cir. 1976), but found them, with the exception of *Newberry*, inopposite as none of them involved a showing of monopoly. The court also stated that the factual setting and rationale of *Newberry* was not applicable.

**9.** The Honorable Elmo B. Hunter, note 1 *supra*.

**10.** 28 U.S.C. § 1292(b) provides:
When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however*, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

**11.** We particularly embrace the statement quoted by our court in *Minnesota v. United States Steel Corp.*, *supra*, 438 F.2d at 1384 n.

In practice, the easier it is to ascertain whether or not the prerequisites for section 1292(b) certification are satisfied, the easier it is to identify whether or not the issue is one suited for section 1292(b) review. When it is particularly difficult to determine whether those three general requirements have been satisfied, then by the nature of the strain in reaching that conclusion, it becomes apparent that section 1292(b) certification is not appropriate.

This is the situation in which we find the Sherman section 2 issue. For even if the Sherman section 2 issue is the determinative one in this lawsuit, the issue is such that the record must be more fully developed so that we can make a precise decision upon a precise record—not an abstract answer to an abstract question. *See Slade v. Shearson, Hammill & Co.*, 517 F.2d 398, 400 (2d Cir. 1974). A more complete factual and legal development in the district court would enable this court to give a better-reasoned and more sound response to the Sherman section 2 question.

Further, once the factual and legal development of this case is completed to the extent that our court has the judicially desirable record upon which the appellate court acts, the decision requested of us may no longer be necessary. There are threshold issues to a private antitrust cause of action which hold the possibility [12] of either being determinative of the outcome or of changing the focus of the cause of action. "Appellate courts cannot waste their time on problems that may never arise or speculate on how the problem will arise." *Control Data Corp. v. IBM Corp., supra*, 421 F.2d at 327. The record before us should assure us that the legal issue has arisen and

exactly how the problem arose before we fashion a response.

For these reasons, interlocutory review of the section 2 Sherman Act issue is not appropriate. *See Molybdenum Corp. v. Kasey*, 279 F.2d 216 (9th Cir. 1960). *See also Slade v. Shearson, Hammill, & Co., supra*, and *Minnesota v. United States Steel Corp., supra*. We in no way criticize the district court for its certification of the section 2 Sherman Act question; indeed, it appeared to this court upon initial review that the question was one appropriate to be accepted and scheduled for briefing and oral argument. That it is not a simple question and that it does not involve a simple factual background is apparent from the fact that close review of the merits of the Sherman section 2 question was necessary before this court arrived at the conclusion that section 1292(b) certification was not proper.

Considering the reason for our decision, we feel it is necessary to develop this opinion further by analyzing the legal issues that are prerequisites to the Sherman section 2 question. Such an analysis will further explain why interlocutory review is not appropriate.

### III. *Analysis*

We first note that this is a private cause of action, authorized by 15 U.S.C. §§ 15, 26, and based on section 2 of the Sherman Act, 15 U.S.C. § 2. The prerequisites to a private party establishing a cause of action under the antitrust laws are well established.

To proceed under section 15, the treble damage provision,[13] the private party

---

11: " 'The predictable element in it all is what courts have done in response to the stimuli of the facts of the concrete cases before them.' " *Id., quoting from* Oliphant, " 'A Return to Stare Decisis,' " *as quoted in* W. Rumble, *American Legal Realism* 161 (1968).

**12.** We cautiously and consciously choose the word "possibility." We in no way intimate any view of the merits; we have formulated none.

**13.** 15 U.S.C. § 15 provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

must show (1) the fact of injury (injury to one's "business or property"); (2) a causal relationship between the fact of injury and the alleged antitrust violation; and (3) damages capable of reasonable ascertainment. *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 893 (8th Cir. 1978); *Reed Bros. v. Monsanto Co.*, 525 F.2d 486, 494 (8th Cir. 1975), *cert. denied*, 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645 (1976); *Morning Pioneer, Inc. v. Bismarck Tribune Co.*, 493 F.2d 383, 387 (8th Cir.), *cert. denied*, 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974).

■ To proceed under section 26, the injunctive relief provision,[14] the plaintiff need only show that there is a threat that he will suffer fact of injury [15] and that such threatened fact of injury is causally related to the defendant's pending antitrust violation. *Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172, 1174–75 (5th Cir. 1976); *Credit Bureau Reports, Inc. v. Retail Credit Co.*, 476 F.2d 989, 992 (5th Cir. 1973). *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). *See also Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972).

Although neither the trial court nor the parties have specifically so stated, we assume that it is section 26 that is applicable to this case [16] inasmuch as the alleged violation of section 2 of the Sherman Act has yet to occur. A preliminary injunction was issued by the district court prohibiting the Star from terminating the now existent independent distributorship contracts. *Paschall v. Kansas City Star Co.*, 441 F.Supp. 349 (W.D.Mo.1977). It is also difficult to tell from the record before us whether the consideration of the elements that make up a private cause of action under section 26 has been held in abeyance pending the outcome of this interlocutory appeal, or whether the parties and the district court agreed to those issues, and have simply not communicated those facts to this court.[17]

The first issue to be determined is what fact of injury does plaintiff allege. In argument, counsel for Paschall states that the public would be hurt by the proposed change in distribution because of the elimination of competition at the distributorship level; counsel also argues that the plaintiffs-dealers will be hurt by the refusal of the Star to sell the paper to the plaintiffs for their businesses.

**14.** 15 U.S.C. § 26 provides:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: *Provided*, That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit in equity for injunctive relief against any common carrier subject to the provisions of the Act to regulate commerce, approved February fourth, eighteen hundred and eighty-seven, in re-

spect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission.

**15.** The Ninth Circuit, in *In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122 (9th Cir.), *cert. denied sub nom., Morgan v. Automobile Mfg. Assoc.*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), held that section 26 "does not require an injury to 'commercial interests' but only an injury cognizable in equity." *Id.* at 130.

**16.** It is because of the necessity of these and other assumptions, albeit reasonable, logical and perhaps obvious assumptions, that we are convinced that consideration of the section 2 Sherman Act issue is unwise at this time.

**17.** We have not lived with this litigation for four and one half years as has the district court. On the basis of the record and briefs before us, we would be required to assume these various facts as they are inherent in rendering a decision on the section 2 issue. *See, e. g.*, note 22 *infra*.

Of these two allegations of potential fact of injury, presumably [18] only the latter is of a sort personal to plaintiffs, and thus sufficient to establish a cause of action. For even though the section 26 requirements are less than that imposed by section 15, *Tugboat, Inc. v. Mobile Towing Co., supra,* 534 F.2d at 1174, the alleged potential injury must still be one which represents personal harm to plaintiffs. *McCleneghan v. Union Stockyards,* 349 F.2d 53, 56 (8th Cir. 1965).[19]

The threshold question is thus limited to whether or not the injury to plaintiffs' businesses that will result to plaintiffs upon termination of the independent distributorship contracts, is a potential injury sufficient to satisfy the first element of a private cause of action under section 26. *See Tugboat, Inc. v. Mobile Towing Co., supra,* 534 F.2d at 1176.

We find nothing in the record before us that indicates an affirmative finding by the trial court in this regard. Plaintiffs' counsel did not indicate in argument, nor is there any discussion in the briefs, as to the specifics of this issue. For example, the trial court explicitly declined to rule on whether "the new delivery agent contracts would eliminate any property interest the plaintiffs had in their existing contracts." [20] The trial court further noted that "[e]ach independent contract carrier was offered an opportunity to negotiate a new contract whereby he or she would make approxi-

mately the same income as under the former contract." There is enough in the record to give rise to the issue; with no ruling on it, the record is incomplete.

If plaintiffs cannot establish this threshold issue of threatened injury cognizable under section 26, plaintiffs' cause of action fails and there is no need to consider the Sherman section 2 issue. If plaintiffs do establish this issue at the district court level, the district court, and perhaps eventually, this court, will benefit greatly from factual development.

Even assuming that, after a full factual and legal inquiry, it is determined that the potential injury which will result from termination of the existing contracts satisfies the threshold question,[21] the record further fails to reveal a consideration of and inquiry into the concept of causation.[22] Once again, the consequential legal and factual development of the record pursuant to an analysis of this issue would allow the district court, and this court, to examine the Sherman section 2 claim in context; further, the issue holds a possibility of termination of the Sherman section 2 litigation, should plaintiffs fail to establish the causal relationship of the alleged antitrust action to the potential injury. This would make it unnecessary for us to decide the Sherman section 2 issue.

The Third Circuit's discussion in *Cromar Co. v. Nuclear Materials & Equip. Corp.,*

---

18. Once again, we must make assumptions in order to formulate intelligent discourse on the subject. Courts are not created for making assumptions. *See* note 16 *supra,* and text accompanying note 12 *supra.*

19. *See SCM Corp. v. Radio Corp.,* 407 F.2d 166, 171 (2d Cir.), *cert. denied,* 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969). *See also Cromar Co. v. Nuclear Materials & Equip. Corp.,* 543 F.2d 501, 505 (3d Cir. 1976).

20. *Paschall v. Kansas City Star Co.,* No. 75–CV–36–W–4, slip op. at n.17. The trial court stated:

[A]ll parties have agreed that I need not decide that issue, and I do not do so. Aside from that concern, I have no reason to think that the carriers would be in any less favorable position to remain a viable delivery system under the delivery agent contract than

under the independent contract carrier contract.
*Id.*

21. *See Farnell v. Albuquerque Publishing Co.,* 589 F.2d 497, 500 (10th Cir. 1978). *See generally Reiter v. Sonotone Corp.,* —— U.S. ——, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979).

22. The gist of a private treble-damage action is not the violation of the antitrust laws, as such, but is the allegation of facts from which it may be inferred that a party plaintiff was caused direct injury to his business or property as a result of such violation. A civil action for treble damages is not based upon the existence of a monopoly or attempt to monopolize, in and of itself.
*Duff v. Kansas City Star Co.,* 299 F.2d 320, 323 (8th Cir. 1962).

*supra*, demonstrates the importance of a full legal and factual inquiry into the concept of causation. *Cromar* not only focuses upon the overriding significance of a full factual development to the issue of causation; it also shows how, if the trial court was to analyze the causation issue, we would necessarily have a more complete record before us in all respects. *Cromar* additionally, by the thoroughness of its discussion of the causation issue, indicates the difficulty this court would have in determining the causal relationship issue on the basis of the limited record before us. Specifically, the court states in *Cromar*:

> Each case, * * * must be carefully analyzed in terms of the particular factual matrix presented. In making this factual determination courts must look to, among other factors, the nature of the industry in which the alleged antitrust violation exists, the relationship of the plaintiff to the alleged violator, and the alleged effect of the antitrust violation upon the plaintiff.[23]

*Id.* at 506. *See id. generally* at 505–09.

Not only would the factual development necessary to an examination of the causal element of this private cause of action be of assistance to this court in determining the interlocutory question—the issues of causation and liability are so intertwined that it is also best that they not be decided separately. Such a procedure is fraught with difficulties, as can be seen by an examination of *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1320–22 & 1323–24 (5th Cir. 1976); *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16 (5th Cir.), *cert. dismissed*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974); and *Haverhill Gazette Co. v. Union Leader Corp.*, 333 F.2d 798 (1st Cir. 1964). These cases demonstrate that whether or not there has been a "violation" necessarily includes a determination of the potential fact of injury and the causal relationship of the alleged

antitrust action to such injury. *But see Jack Winter, Inc. v. Koratron Co.*, 375 F.Supp. 1, 65 n.90 (N.D.Cal.1974).

*Terrell* involved an antitrust trial which resulted in a $375,000 jury verdict against defendant-Household Goods Carriers' Bureau and defendants-individual carriers. The trial court entered judgment on the verdict against the Bureau. En banc, the Fifth Circuit affirmed the trial court's judgment against the Bureau, but reversed for a new trial on the issue of damages. The jury verdict on the new trial was against the Bureau for $300,000.

On appeal, Bureau maintained that the en banc court had affirmed the jury's determination that the Bureau had *violated* the Sherman Act, but commanded retrial on the twin issues of causation and the amount of damages. On appeal from the retrial, the issue raised by Bureau was that there was insufficient evidence on the issue of causation to support the jury's verdict for Terrell.

The Fifth Circuit did not reach Bureau's argument inasmuch as it determined (1) the en banc decision represented the law of the case and (2) the en banc decision necessarily encompassed a finding of legal violation causally related to a "fact of injury," in that a finding of injury was legally a necessary prerequisite to a decree of liability in a private antitrust suit.

The *Terrell* court also referred to *Haverhill Gazette Co. v. Union Leader Corp.*, *supra*. Although *Haverhill* presented the issue of distinguishing between legal violation and causation in a factual setting different from *Terrell*, see *Terrell v. Household Goods Carriers' Bureau*, *supra*, 494 F.2d at 22 n.11, the rationales of both opinions are consistent. The *Haverhill* court was faced with conflicting findings between an earlier decree by the trial court finding antitrust liability and granting injunctive and declaratory relief by a "partial final

23. The *Cromar* case speaks in terms of "standing" instead of "establishing a cause of action." The terms focus on the same issues however, and the language in *Cromar* goes to the question of whether plaintiff was hurt " 'by reason of anything forbidden in the antitrust laws.' " *Cromar Co. v. Nuclear Materials & Equip. Corp., supra*, 543 F.2d at 506, *quoting from* 15 U.S.C. § 15.

decree," and the trial court's affirmance of the special masters report on damages caused by defendant's wrongful conduct prior to the declaratory and injunctive relief. The latter included findings in regard to causation and damages that did not "square with" the statements made by the trial court in the initial finding of antitrust liability.

In order to remedy the structural inconsistency, the *Haverhill* court held that the "partial final decree" of liability was interlocutory in nature; thus, the earlier findings on causation could be subject to revision.

The *Haverhill* court noted:

In a private antitrust action liability and damages are not separate. Granting that an injunction may require a finding of merely threatened loss, 15 U.S.C. § 26, a partial decree on all issues of liability, *however considered,* implies much more. One cannot think of private liability for violation of the antitrust laws except in terms of impact and damage.[24]

*Haverhill Gazette Co. v. Union Leader Corp., supra,* 333 F.2d at 802 (emphasis added). *Accord, Response of Carolina, Inc. v. Leasco Response, Inc., supra.*[25]

By relying upon language of the First Circuit in *Haverhill,* we do not ignore the fact that section 1292(b) is explicitly a matter of interlocutory determination, and that it is procedurally possible for us to decide the interlocutory issue. Indeed, as Judge Lay writes in *Minnesota v. United States Steel Corp., supra,* 438 F.2d at 1384, "[w]e have no doubt that determination of the substantive issues of the appeal at this time

would be helpful to the district court and all of the parties." But to do so in this case at this time would be judicially extravagant.

As was pointed out in *Minnesota* and as is equally applicable here:

Courts have traditionally been reluctant to grant interlocutory appeals not only because of the lack of finality of the order under review but also because the incomplete factual proof gives few guides for a proper decision. The integrity of the appellate process would be compromised if advisory opinions were rendered on hypotheses which evaporated in the light of full factual development. The legal questions should not be considered in the abstract. There must be precision in proof of fact worthy to serve as the premises essential to balance and weigh the legal issues involved. Upon full review of the record we are satisfied that precision is lacking here. Our analysis leads us to conclude that the issues presented on this appeal are too significant and far-reaching to be decided without the full evidentiary record.

*Id.* at 1384 (footnote omitted).

Because "[p]roof of damage or injury to the plaintiff resulting [from the antitrust violation] is of the essence of the claim," *Carswell Trucks, Inc. v. International Harvester Co.,* 334 F.Supp. 1238, 1239 (S.D.N.Y. 1971), *citing McCleneghan v. Union Stockyards,* 349 F.2d 53 (8th Cir. 1965), we decline to answer the question before us on interlocutory review.

We hold that interlocutory review was improvidently granted and we vacate the

**24.** *See generally Billy Baxter, Inc. v. Coca-Cola Co.,* 431 F.2d 183, 187 (2d Cir. 1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971), *quoting from Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968):

The private action, intended as "an ever present threat to deter anyone contemplating business behavior in violation of the antitrust laws," * * * can only serve as an effective deterrent if the courts are able to administer it with some degree of certainty. Contourless rules of causation would pose the threat of a parallel relaxation of the standard

of business behavior enforced by the allowance of treble recovery.

*See, e. g., Lee-Moore Oil Co. v. Union Oil Co.,* 441 F.Supp. 730 (M.D.N.C.1977); *Nelson v. Pacific S. W. Airlines,* 399 F.Supp. 1025 (S.D.Cal. 1975); *Kelly v. General Motors Corp.,* 425 F.Supp. 13 (E.D.Pa.1976). *But see Murphy Tugboat Co. v. Crowley,* 454 F.Supp. 847 (N.D. Cal.1978); *Jack Winter, Inc. v. Koratron Co.,* 375 F.Supp. 1, 65 n.90 (N.D.Cal.1974).

**25.** An excellent case explaining in detail the essence of a private antitrust cause of action is *Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 316–18 (5th Cir. 1978).

acceptance of the appeal. This case is remanded to the district court for proceedings not inconsistent with this opinion.